[Nos. B194314, B196120. Second Dist., Div. Four. Dec. 19, 2008.]

RAFI MOGHADAM, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION[†]]**

---

†Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for partial publication. The portions directed to be published are: Introduction, Factual and Procedural History, section II.A., B., and C., Discussion, section 1.A., B., and C., and Disposition.

## COUNSEL

Rafi Moghadam, in pro. per., for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Alan R. Zuckerman, Rand D. Carstens; and Cynthia A. Vroom for Defendants and Respondents.

## OPINION

**SUZUKAWA, J.—**

### INTRODUCTION

Plaintiff and appellant Rafi Moghadam (plaintiff) brought the present action against the Regents of the University of California (Regents) and nine of its officers and employees (collectively, defendants) for alleged violations of the Information Practices Act of 1977, Civil Code section 1798 et seq. (IPA or Act).[1] The IPA is a privacy statute that, among other things, limits the kinds of personal information that public agencies may maintain, requires agencies to maintain personal information "with accuracy, relevance, timeliness, and completeness," and permits individuals to inspect and request correction of agency-maintained personal information. (§ 1798.18.)

The core of plaintiff's claim is that defendants refused to allow him to inspect and obtain copies of some of his midterm and final exams. Among his many other claims, he also alleges that defendants destroyed some of his

---

[1] All further undesignated statutory references are to the Civil Code.

exams after he asked to inspect them, maintained inaccurate and irrelevant information in his university records, failed to designate an IPA compliance officer, failed to properly safeguard the privacy of student exams, and failed to promulgate appropriate directives to ensure university-wide compliance with the IPA.

The trial court granted summary judgment for defendants, concluding principally that plaintiff had not introduced any evidence that he suffered harm as a result of defendants' alleged IPA violations. After judgment was entered, the court declared defendants the prevailing parties and awarded them costs pursuant to Code of Civil Procedure section 1032. Plaintiff appeals from both the judgment and the cost award.

In the published portion of this opinion, we conclude that student exams are not "records" containing "personal information" within the meaning of the IPA. Defendants' alleged refusal to allow plaintiff to inspect or copy some of his exams, thus, does not violate the IPA as a matter of law. In the unpublished portion of this opinion, we conclude that plaintiff failed to introduce evidence that any of the other alleged IPA violations had an adverse effect on him; the trial court did not abuse its discretion by any of its pretrial rulings; and the trial court did not err in denying plaintiff's motion to tax costs. We thus affirm both the judgment and the cost award.

## FACTUAL AND PROCEDURAL HISTORY

I.  *Plaintiff's Prior IPA Action*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II.  *The Present Action*

A.  *The Complaint*

Plaintiff filed the present action on December 8, 2004, against the Regents; Governor Arnold Schwarzenegger, as president of the Board of Regents; Robert C. Dynes, president of the University of California; Albert Carnesale, University of California, Los Angeles's (UCLA) chancellor; Rebecca B. Beatty, UCLA's director of business and administrative services; Lee Ohanian, a UCLA professor; Anita Cotter, UCLA's registrar; and the three individual defendants named in the prior suit. The operative second amended complaint, filed May 6, 2005, asserts 12 causes of action under the IPA: (1) failure to maintain

---

[*]See footnote, *ante*, page 466.

plaintiff's records, in violation of section 1798.18[2]; (2) failure to establish appropriate rules of conduct " 'for persons involved in the design, development, operation, disclosure, or maintenance of records containing personal information,' " in violation of section 1798.20[3]; (3) failure to install safeguards to protect personal records, including student exams (which the complaint alleges are left "in hallways, unguarded and open to unauthorized inspection"), in violation of section 1798.21[4]; (4) failure to designate an employee responsible for compliance with the IPA, in violation of section 1798.22[5]; (5) failure to adopt guidelines to protect rights under the IPA, particularly as they relate to the release of student exams, in violation of section 1798.30[6]; (6) failure to provide plaintiff with the title and business address of the agency official responsible for maintaining his records, the procedures to be followed to gain access to his records, and the procedures to be followed to contest the contents of those records, in violation of section 1798.32[7]; (7) failure to allow plaintiff to inspect his personal records, including his exams, in violation of section 1798.34, subdivision (a)[8]; (8) failure

[2] Section 1798.18 states: "Each agency shall maintain all records, to the maximum extent possible, with accuracy, relevance, timeliness, and completeness. [¶] Such standard need not be met except when such records are used to make any determination about the individual. When an agency transfers a record outside of state government, it shall correct, update, withhold, or delete any portion of the record that it knows or has reason to believe is inaccurate or untimely."

[3] Section 1798.20 states: "Each agency shall establish rules of conduct for persons involved in the design, development, operation, disclosure, or maintenance of records containing personal information and instruct each such person with respect to such rules and the requirements of this chapter, including any other rules and procedures adopted pursuant to this chapter and the remedies and penalties for noncompliance."

[4] Section 1798.21 states: "Each agency shall establish appropriate and reasonable administrative, technical, and physical safeguards to ensure compliance with the provisions of this chapter, to ensure the security and confidentiality of records, and to protect against anticipated threats or hazards to their security or integrity which could result in any injury."

[5] Section 1798.22 states: "Each agency shall designate an agency employee to be responsible for ensuring that the agency complies with all of the provisions of this chapter."

[6] Section 1798.30 states: "Each agency shall either adopt regulations or publish guidelines specifying procedures to be followed in order fully to implement each of the rights of individuals set forth in this article."

[7] Section 1798.32 states in pertinent part: "Any notice sent to an individual which in any way indicates that the agency maintains any record concerning that individual shall include the title and business address of the agency official responsible for maintaining the records, the procedures to be followed to gain access to the records, and the procedures to be followed for an individual to contest the contents of these records unless the individual has received this notice from the agency during the past year."

[8] Section 1798.34, subdivision (a) states: "Except as otherwise provided in this chapter, each agency shall permit any individual upon request and proper identification to inspect all the personal information in any record containing personal information and maintained by reference to an identifying particular assigned to the individual within 30 days of the agency's receipt of the request for active records, and within 60 days of the agency's receipt of the request for records that are geographically dispersed or which are inactive and in central

to allow plaintiff to copy his personal records, including his exams, in violation of section 1798.34, subdivision (b)[9]; (9) failure to decipher coded information in plaintiff's financial aid records, in violation of section 1798.34, subdivision (c)[10]; (10) failure to allow plaintiff to correct inaccurate data in his personal records, in violation of section 1798.35[11]; (11) failure to allow plaintiff to seek a review "by the head of the agency or an official specifically designated by the head of such agency," in violation of section 1798.36[12]; and (12) destruction of plaintiff's records, including his exams, in violation of section 1798.77.[13]

storage. Failure to respond within these time limits shall be deemed denial. In addition, the individual shall be permitted to inspect any personal information about himself or herself where it is maintained by reference to an identifying particular other than that of the individual, if the agency knows or should know that the information exists. The individual also shall be permitted to inspect the accounting made pursuant to Article 7 (commencing with Section 1798.25)."

[9] Section 1798.34, subdivision (b) states: "The agency shall permit the individual, and, upon the individual's request, another person of the individual's own choosing to inspect all the personal information in the record and have an exact copy made of all or any portion thereof within 15 days of the inspection. It may require the individual to furnish a written statement authorizing disclosure of the individual's record to another person of the individual's choosing."

[10] Section 1798.34, subdivision (c) states: "The agency shall present the information in the record in a form reasonably comprehensible to the general public."

[11] Section 1798.35 states: "Each agency shall permit an individual to request in writing an amendment of a record and, shall within 30 days of the date of receipt of such request: [¶] (a) Make each correction in accordance with the individual's request of any portion of a record which the individual believes is not accurate, relevant, timely, or complete and inform the individual of the corrections made in accordance with their request; or [¶] (b) Inform the individual of its refusal to amend the record in accordance with such individual's request, the reason for the refusal, the procedures established by the agency for the individual to request a review by the head of the agency or an official specifically designated by the head of the agency of the refusal to amend, and the name, title, and business address of the reviewing official."

[12] Section 1798.36 states: "Each agency shall permit any individual who disagrees with the refusal of the agency to amend a record to request a review of such refusal by the head of the agency or an official specifically designated by the head of such agency, and, not later than 30 days from the date on which the individual requests such review, complete such review and make a final determination unless, for good cause shown, the head of the agency extends such review period by 30 days. If, after such review, the reviewing official refuses to amend the record in accordance with the request, the agency shall permit the individual to file with the agency a statement of reasonable length setting forth the reasons for the individual's disagreement."

[13] Section 1798.77 states: "Each agency shall ensure that no record containing personal information shall be modified, transferred, or destroyed to avoid compliance with any of the provisions of this chapter. In the event that an agency fails to comply with the provisions of this section, an individual may bring a civil action and seek the appropriate remedies and damages in accordance with the provisions of Article 9 (commencing with Section 1798.45). [¶] An agency shall not remove or destroy personal information about an individual who has requested access to the information before allowing the individual access to the record containing the information."

Plaintiff filed an application for a temporary restraining order (TRO) on December 8, 2004. The court granted a TRO, but denied plaintiff's subsequent application for a preliminary injunction on February 3, 2005. Plaintiff appealed from the denial of his request for a preliminary injunction; on September 11, 2006, this court dismissed the appeal as moot after the trial court entered judgment for defendants.

## B. *Defendants' Motion for Summary Judgment*

On April 19, 2006, defendants filed a motion for summary judgment or, in the alternative, summary adjudication of issues. Plaintiff opposed the motion.

On July 17, 2006, the day that the summary judgment motion was scheduled to be heard, plaintiff filed an ex parte application for an order shortening time to file a motion for leave to file a third amended complaint. In support, plaintiff explained that he wished to amend his complaint to add a cause of action under the free speech provisions of the state and federal Constitutions and to correct errors in his complaint. The trial court denied plaintiff's application, concluding that he had not made a sufficient showing of good cause.

On July 26, 2006, the trial court granted defendants' motion for summary judgment, finding as follows:

—There was no material evidence that plaintiff had incurred damages resulting from defendants' alleged breaches of the IPA.

—The complaint did not allege any facts suggesting that the individual defendants acted outside the scope of their official capacities, and there was no material evidence of any such conduct.

—As to the first cause of action (alleging a failure to maintain plaintiff's records), there was no material evidence of plaintiff's claim that his records had been maintained in violation of section 1798.18.

—As to the second, fourth, fifth, and sixth causes of action (alleging absence of proper IPA procedures), there were no triable issues of fact to support plaintiff's claims. Specifically, there was no credible evidence to dispute that Rebecca Beatty was UCLA's information practices coordinator or that the Regents had appropriate policies and procedures to protect the privacy, maintenance, and destruction of records. Further, the Regents' policy of discarding exams did not violate section 1798.18, and plaintiff had not

proffered any evidence that his exams had been destroyed in violation of IPA policy and procedures or due to the absence of such policies and procedures.

—As to the second, third, and twelfth causes of action (alleging destruction of plaintiff's records), there was no material evidence that the Regents or its agents had destroyed any of plaintiff's records in contravention of section 1798.18.

—As to the seventh and eighth causes of action (alleging failure to give plaintiff access to his personal records), it was undisputed that defendants had given plaintiff access to all of his exams except his Economics 102 exam; as to that exam, there was no material evidence that its loss resulted from violations of section 1798.18. Further, the undisputed evidence established that defendants had provided plaintiff all nonprivileged documents responsive to his October 29, 2003, inspection demand, in compliance with section 1798.34, subdivision (b).

—As to the ninth cause of action (alleging that the financial aid office maintained encrypted information in plaintiff's records), there was no material dispute that the so-called "encrypted" information were staff initials, the use of which did not violate section 1798.34, subdivision (c).

—As to the tenth cause of action (alleging that defendants have refused to amend inaccurate information in plaintiff's records), there was no material evidence that plaintiff had ever identified the allegedly inaccurate records. Further, as to plaintiff's claim that his records did not reflect that he was "IGETC" certified and that this inaccuracy prevented his graduation from the university, there was no material evidence disputing that UCLA had recorded plaintiff's "IGETC" certification on May 19, 2005, or that he had graduated from UCLA effective winter quarter 2005.

—As to the eleventh cause of action (alleging that defendants had prevented plaintiff from obtaining a review by the agency head), there was no material evidence that plaintiff ever established the prerequisite for a review—i.e., an initial refusal by the agency to amend a record—as required by section 1798.36.

The trial court entered judgment on August 17, 2006. Plaintiff filed this timely appeal from judgment on October 5, 2006 (B194314).

### C. *Plaintiff's Motion to Tax Costs*

After judgment was entered, defendants filed a memorandum of costs, requesting $13,242. Plaintiff moved to tax costs on the grounds that

(1) defendants were not the prevailing parties; (2) defendants' costs memorandum was unverified; and (3) defendants' costs were excessive and not reasonably necessary to the conduct of the litigation.

The motion to tax costs was heard on November 6, 2006. The court found that defendants failed to establish that plaintiff had requested a Farsi interpreter at his deposition, and it thus deducted interpreter's fees of $4,210. It overruled plaintiff's other objections and awarded defendants costs of $9,032. Plaintiff filed a timely notice of appeal from the costs award on January 2, 2007 (B196120).

## DISCUSSION

I. *The Trial Court Properly Granted Defendants' Motion for Summary Judgment*

A. *Standard of Review*

The standard of review for summary judgment is well established. The motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A moving defendant has met its burden of showing that a cause of action has no merit by establishing that one or more elements of a cause of action cannot be established or that there is a complete defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849–850 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Lackner v. North* (2006) 135 Cal.App.4th 1188, 1196 [37 Cal.Rptr.3d 863].)

We independently review an order granting summary judgment, viewing the evidence in the light most favorable to the nonmoving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Lackner v. North, supra,* 135 Cal.App.4th at p. 1196.) To perform our independent review of the evidence, "we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue." (*Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1438 [111 Cal.Rptr.2d 534].)

" 'If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any legal ground applicable to

this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal. [Citation.]' " (*Medill v. Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 827–828 [49 Cal.Rptr.3d 570]; see also *WRI Opportunity Loans II, LLC v. Cooper* (2007) 154 Cal.App.4th 525, 541, fn. 12 [65 Cal.Rptr.3d 205] ["absent a triable issue of material fact, we may affirm the grant of summary judgment 'if it is correct on any theory of law applicable to the case, including but not limited to the theory adopted by the trial court' "].) However, before affirming on a ground not relied on by the trial court, we must afford the parties an opportunity to present their views by submitting supplemental briefs. (Code Civ. Proc., § 437c, subd. (m)(2).)

### B. *The Information Practices Act*

As noted above, each of plaintiff's 12 causes of action alleged a violation of the IPA. " 'The Information Practices Act, enacted in 1977, generally imposes limitations on the right of governmental agencies to disclose personal information about an individual. (*Anti-Defamation League of B'nai B'rith v. Superior Court* (1998) 67 Cal.App.4th 1072, 1078–1079 [79 Cal.Rptr.2d 597]; *Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509, 514, fn. 2 [223 Cal.Rptr. 58].) "The statute was designed by the Legislature to prevent misuse of the increasing amount of information about citizens which government agencies amass in the course of their multifarious activities, the disclosure of which could be embarrassing or otherwise prejudicial to individuals or organizations." (*Anti-Defamation League of B'nai B'rith, supra,* 67 Cal.App.4th at p. 1079.)' (*Jennifer M. v. Redwood Women's Health Center* (2001) 88 Cal.App.4th 81, 87–88 [105 Cal.Rptr.2d 544].)" (*Bates v. Franchise Tax Bd.* (2004) 124 Cal.App.4th 367, 373 [21 Cal.Rptr.3d 285].)

" 'Under the Act, state agencies are required to limit the collection and retention of personal information to that necessary to accomplish the agency's specific purpose (§ 1798.14). If an agency maintains such a record (§ 1798.32), individuals must be informed when they request it.' (*Perkey v. Department of Motor Vehicles* (1986) 42 Cal.3d 185, 193 [228 Cal.Rptr. 169, 721 P.2d 50].)" (*Bates v. Franchise Tax Bd., supra,* 124 Cal.App.4th at p. 373.) Further, agencies must maintain records as accurately and completely as possible (§ 1798.18) and, if asked to correct a record, an agency must either timely do so or advise the individual making the request why it will not do so (§ 1798.35).

There is a private right of action for violations of the IPA under some circumstances. Specifically, pursuant to section 1798.45 of the Act, an individual may bring a civil action if an agency does any of the following:

"(a) Refuses to comply with an individual's lawful request to inspect pursuant to subdivision (a) of Section 1798.34.

"(b) Fails to maintain any record concerning any individual with such accuracy, relevancy, timeliness, and completeness as is necessary to assure fairness in any determination relating to the qualifications, character, rights, opportunities of, or benefits to the individual that may be made on the basis of such record, if, as a proximate result of such failure, a determination is made which is adverse to the individual.

"(c) Fails to comply with any other provision of this chapter, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual." (§ 1798.45, subds. (a)–(c).)

We address each of plaintiff's alleged IPA violations below.[14]

C. *Defendants Are Entitled to Summary Adjudication of Plaintiff's Claims That the University Failed to Safeguard the Privacy of Student Exams and to Allow Plaintiff to Inspect and Copy His Exams (First, Third, Fifth, Seventh, Eighth, and Twelfth Causes of Action)*

Plaintiff's first, third, fifth, seventh, eighth, and twelfth causes of action allege violations of the IPA arising out of defendants' alleged handling of his and other students' midterm and final exams. Specifically, plaintiff alleges that defendants failed to maintain his exams as the statute requires (first cause of action), failed to safeguard the privacy of student exams (third cause of action), failed to promulgate appropriate guidelines concerning the release of student exams (fifth cause of action), refused to allow plaintiff to inspect and copy some of his midterm and final exams (seventh and eighth causes of action), and destroyed some of plaintiff's exams after he asked to inspect them (twelfth cause of action).[15]

---

[14] We discuss several alleged violations in more than one part of this opinion because several fail to survive summary judgment for more than one reason.

[15] Plaintiff's second amended complaint identifies the following allegedly withheld exams: midterm exam for Economics 171; final exam for Economics 102; midterm and final exams for Economics 150; midterm and final exams for Physics 6A; midterm and final exams for Life

The trial court summarily adjudicated these causes of action because, among other things, it concluded there was no evidence that plaintiff had suffered any damages as a result. Having thus resolved the motion, the trial court did not address what we believe is a logically prior question: Whether exams are subject to the IPA at all.[16] For the reasons that follow, we conclude that they are not.

1. *The IPA Applies Only to "Records" Containing "Personal Information"*

■ The IPA's scope, while broad, does not encompass all documents or information handled or maintained by government agencies. Rather, by its terms, the IPA governs the maintenance and disclosure of agency-maintained "records" containing "personal information."[17] *"Records"* are defined as "any

Sciences 1; final exam for Life Sciences 3; midterm and final exams for Economics 11; midterm and final exams for Economics 101; final exam for Chemistry 153AH; midterm exam for Life Sciences 4; and midterm and final exams for Economics 160.

Plaintiff asserts that his seventh and eighth causes of action are not limited to defendants' alleged refusal to allow him to inspect and copy these exams because "[t]he complaint states that plaintiff seeks access to numerous records, *'including, but not limited to'* " the exams enumerated therein. (Italics added.) He acknowledges that he has never identified any other records that defendants have withheld from him, but he contends that it is defendants' obligation to identify those records, not his. Accordingly, he suggests, because defendants have never established "a complete list and detailed description of the documents envisioned by the complaint as falling within the purview of the IPA," this court cannot affirm the grant of summary judgment.

We disagree that it is *defendants'* burden to articulate *plaintiff's* claims for relief. Indeed, if we were to adopt plaintiff's view of the parties' respective summary judgment burdens, a plaintiff could in every case avoid summary judgment by alleging that defendants had violated the law in ways not specified in the complaint. That is not the law. Instead, " '[t]he burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint.* A "moving party need not '. . . refute liability on some theoretical possibility not included in the pleadings.' [Citations.]" ' " (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 332 [40 Cal.Rptr.3d 313].)

[16] We note that this issue was not addressed by the trial court or briefed by the parties. Therefore, pursuant to Code of Civil Procedure section 437c, subdivision (m)(2) and Government Code section 68081, on July 15, 2008, we asked the parties to submit supplemental letter briefs addressing the following four questions: (1) Do the documents sought by plaintiff contain "personal information" as defined by section 1798.3, subdivision (a)? (2) Do the documents sought by plaintiff constitute "records" as defined by section 1798.3, subdivision (g)? (3) Are the documents sought by plaintiff "maintained" by defendants within the meaning of section 1798.3, subdivision (e)? (4) What is the impact, if any, of section 1798.74 on the present case?

[17] E.g., section 1798.14 ("Each agency shall maintain in its records only personal information which is relevant and necessary . . ."), section 1798.19 ("Each agency when it provides by contract for the operation or maintenance of records containing personal information to accomplish an agency function, shall cause . . . the requirements of this chapter to be applied to those records."), section 1798.20 (each agency shall establish rules of conduct for persons involved in the disclosure or maintenance of "records containing personal information"), section

file or grouping of information about an individual that is maintained by an agency by reference to an identifying particular such as the individual's name, photograph, finger or voice print, or a number or symbol assigned to the individual." (§ 1798.3, subd. (g).) *"Personal information"* is defined as "any information that is maintained by an agency that identifies or describes an individual, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history. It includes statements made by, or attributed to, the individual." (§ 1798.3, subd. (a).) Student exams therefore are subject to the IPA only if they are "records" containing "personal information" within the meaning of the statute.

### 2. *Plaintiff's Exams Are Not "Records"*

To our knowledge, no court has construed the term "records" in the context of the IPA. However, in *Owasso Independent School Dist. No. I-011 v. Falvo* (2002) 534 U.S. 426 [151 L.Ed.2d 896, 122 S.Ct. 934] (*Falvo*), the United States Supreme Court construed "education[al] records" as used in an analogous federal statute, the Family Educational Rights and Privacy Act (FERPA), 20 United States Code section 1232g. Under FERPA, "education[al] records" are "those records, files, documents, and other materials which . . . [¶] (i) contain information directly related to a student; and [¶] (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." (20 U.S.C. § 1232g(a)(4)(A).)

The issue before the court in *Falvo* was whether "peer grading" (allowing students to score each other's tests, papers, or assignments) violated FERPA's privacy provisions. The plaintiff was the mother of three children enrolled in the defendant school district. Plaintiff claimed that peer grading embarrassed her children and violated FERPA's privacy provisions. (*Falvo, supra*, 534 U.S. at pp. 429–430.) The district court found that peer-graded exams were not "education[al] records" subject to FERPA, and it thus granted summary judgment for defendants. The Court of Appeals reversed, holding that peer-graded exams were "education records" and so the very act of grading was an impermissible release of confidential information to the student graders. (534 U.S. at pp. 429–430.)

---

1798.28 ("Each agency . . . shall inform any person or agency to whom a record containing personal information has been disclosed during the preceding three years of any correction of an error or notation of dispute . . ."), section 1798.34 (agencies shall permit individuals to inspect "all the personal information in any record containing personal information" and to have a copy made of "all the personal information in the record").

The Supreme Court reinstated the district court's grant of summary judgment, finding no violation of FERPA as a matter of law. It noted that under FERPA, an educational record is one *"maintained by an educational agency or institution* or by a person acting for such agency or institution." (20 U.S.C. § 1232g(a)(4)(A), italics added.) Peer-graded assignments, the court said, are not so "maintained." It explained: "The ordinary meaning of the word 'maintain' is 'to keep in existence or continuance; preserve; retain.' Random House Dictionary of the English Language 1160 (2d ed. 1987). Even assuming the teacher's grade book is an education record—a point the parties contest and one we do not decide here—the score on a student-graded assignment is not 'contained therein,' § 1232g(b)(1), until the teacher records it. The teacher does not maintain the grade while students correct their peers' assignments or call out their own marks. Nor do the student graders maintain the grades within the meaning of § 1232g(a)(4)(A). The word 'maintain' suggests FERPA records will be kept in a filing cabinet in a records room at the school or on a permanent secure database, perhaps even after the student is no longer enrolled. The student graders only handle assignments for a few moments as the teacher calls out the answers. It is fanciful to say they maintain the papers in the same way the registrar maintains a student's folder in a permanent file." (*Falvo, supra*, 534 U.S. at pp. 432–433.)

Further, the court noted that FERPA requires " 'a record' " of access for each pupil, which must be kept " 'with the education records.' " (*Falvo, supra*, 534 U.S. at p. 434.) "This suggests Congress contemplated that education records would be kept in one place with a single record of access. By describing a 'school official' and 'his assistants' as the personnel responsible for the custody of the records, FERPA implies that education records are institutional records kept by a single central custodian, such as a registrar, not individual assignments handled by many student graders in their separate classrooms." (*Id.* at pp. 434–435.)

Finally, the court noted that FERPA requires educational institutions that receive federal funds to provide parents with a hearing at which they may contest the accuracy of their child's education records. (20 U.S.C. § 1232g(a)(2).) The hearings must be conducted "in accordance with regulations of the Secretary" (*ibid.*), which in turn require adjudication by a disinterested official and the opportunity for parents to be represented by an attorney. (34 C.F.R. § 99.22 (2001).) The court found it "doubtful" that Congress "would have provided parents with this elaborate procedural machinery to challenge the accuracy of the grade on every spelling test and art project the child completes." (*Falvo, supra*, 534 U.S. at p. 435; see also *BRV, Inc. v. Superior Court* (2006) 143 Cal.App.4th 742, 754 [49 Cal.Rptr.3d 519] [Pupil record "is one that 'directly relates' to a student and is 'maintained' by

the school. We agree with the Supreme Court that the statute was directed at institutional records maintained in the normal course of business by a single, central custodian of the school. Typical of such records would be registration forms, class schedules, grade transcripts, discipline reports, and the like."].)

■ The Supreme Court's analysis in *Falvo* is instructive here. Like FERPA, the IPA defines a "record" as a "file" that is "maintained" by an "agency." (§ 1798.3, subd. (g).) Under both statutes, thus, a file must be "maintained" to be a "record" entitled to privacy protection. We agree with the Supreme Court that the ordinary meaning of "maintain" is "to keep in existence or continuance; preserve." (Random House Webster's College Dict. (1992) p. 819; see also Merriam-Webster Online (2008) <http://www.merriam-webster.com> [as of Dec. 19, 2008] ["to keep in an existing state"].) We thus conclude that, like FERPA, the IPA applies only to institutional records that are preserved in the ordinary course of business by a single, central custodian. In a university context, registration forms and transcripts would be typical of such records.

In the present case, it is undisputed that student exams are not stored or maintained by the University in a central location. Instead, pursuant to the University's written academic policies, exams are either returned to the student or held by the individual instructor until the end of the next succeeding regular term of instruction. Under no circumstances are they "maintained" by the University. They therefore are not "records" within the meaning of section 1798.3, subdivision (g).

Other provisions of the IPA reinforce our conclusion that student exams are not "records" subject to the IPA. Pursuant to section 1798.35, each agency shall "permit an individual to request in writing an amendment of a record" and shall, within 30 days of the date of receipt of such request, either to "[m]ake each correction in accordance with the individual's request of any portion of a record which the individual believes is not accurate, relevant, timely, or complete," or "[i]nform the individual of its refusal to amend the record in accordance with such individual's request, the reason for the refusal, the procedures established by the agency for the individual to request a review by the head of the agency . . . , and the name, title, and business address of the reviewing official." If student exams are "records" under the IPA, then section 1798.35 gives students the right to request "amendment" of their exam answers after the exams are completed. Further, it requires universities either to "[m]ake each correction in accordance with the [student's] request" or to "[i]nform the [student] of its refusal" to do so. Finally, if student exams are "records" under the IPA, then section 1798.35 gives students the right to appeal exam-related decisions to the "head of the agency"—i.e., the university's dean or chancellor. We find it unlikely that the

Legislature intended, through the vehicle of the IPA, to permit students to "amend" their midterm and final exams after those exams have been completed and graded or to require university heads to adjudicate exam disputes.

For all of these reasons, we conclude that student exams are not "records" within the meaning of the IPA.

### 3. *Plaintiff's Exams Do Not Contain "Personal Information"*

As we have indicated, the IPA applies to "records" containing "personal information." "Personal information" is "any information that is maintained by an agency that *identifies or describes an individual*, including, but not limited to, his or her name, social security number, physical description, home address, home telephone number, education, financial matters, and medical or employment history," as well as "statements made by, or attributed to, the individual." (§ 1798.3, subd. (a), italics added.)

No reported decision has construed the term "personal information" as used in the IPA, and thus we again reason by analogy to federal statute. Pursuant to the federal Privacy Act (Privacy Act), 5 United States Code section § 552a, "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains . . . ." (5 U.S.C. § 552a(b).) A "record" is "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph." (5 U.S.C. § 552a(a)(4).)

In *Tobey v. N.L.R.B.* (D.C. Cir. 1994) 309 U.S. App.D.C. 213 [40 F.3d 469], the Court of Appeals considered when an item or collection of information is "about an individual" within the meaning of the Privacy Act. There, the plaintiff worked as a National Labor Relations Board (NLRB) field officer. The NLRB used a computer system to track unfair labor practices case data, including case names, allegations made, dates of significant events, and the initials or identifying number of the field examiner assigned to the case. (40 F.3d at p. 470.) When the plaintiff filed a grievance with the NLRB, his supervisor used the computer system to conduct a search of the cases assigned to plaintiff over the prior several years. (*Id.* at p. 471.) Plaintiff then sued under the Privacy Act, contending that the NLRB had, without proper notice, maintained and used a system of records (the computer system) to retrieve personal information about him and had disclosed that information to others. (40 F.3d at p. 471.)

The district court dismissed plaintiff's suit, concluding that the data retrieved were not "records" within the meaning of the Privacy Act. (*Tobey v. NLRB, supra*, 40 F.3d at p. 471.) The court of appeals affirmed. It noted that to be a record, information must be "about" an individual. (*Ibid.*) The NLRB's computer system, however, did not contain information "about" individuals—instead, it contained information " 'about' NLRB cases, such as the case name, the allegations made, the number of private-sector employees involved and the date of settlement, hearing, dismissal or closing of the case." (*Ibid.*) "Admittedly, the system also includes the number and initials of the field examiner assigned to the case. But this no more means the information is 'about' the individual than it means the information is 'about' the date on which the case settled." (*Ibid.*) Thus, the court concluded, the NLRB's computer system was not a system of records "about" the plaintiff. (*Id.* at pp. 472–473.)

The court reached a similar result in *Fisher v. National Institutes of Health* (D.D.C. 1996) 934 F.Supp. 464. There, the plaintiff was a physician whose articles appeared in numerous biomedical journals. Defendants were several national health organizations that maintained computer databases containing information about the articles published in such journals. (*Id.* at p. 467.) Each file in the defendants' database provided bibliographic information about an article, including the article's title, the name of the publication in which the article appeared, the name of the article's author, and a summary or abstract of the article. After a colleague of plaintiff's was placed under investigation for altering patient files, defendants annotated summaries of articles incorporating suspect patient data, including plaintiff's, with the phrase " '[scientific misconduct—data to be reanalyzed].' " (*Ibid.*)

Plaintiff sued defendants for Privacy Act violations, asserting that the database files contained information "about" him, and thus were records for purposes of the Privacy Act, because (1) " 'nothing tells more "about" a research scientist . . . than his scientific publications, speeches and the like,' " [citation], and (2) the database files . . . contain both [plaintiff's] name and address." (*Fisher v. National Institutes of Health, supra*, 934 F.Supp. at p. 469.) The district court disagreed and granted defendants' motion for summary judgment. It explained: "The court concludes that the database files are 'about' the articles and not Dr. Fisher or the other authors listed. The names of the authors and the annotations are part of the overall information on the articles. The fact that a reader of the abstracts could glean some insight into the type of work Dr. Fisher does by the type of articles he authors or co-authors is not sufficient to make the database files records under the Privacy Act." (*Id.* at p. 470.) Further, the court said, the inclusion of plaintiff's name did not transform the database files into records. "This circuit has held that the fact that a file or document contains an individual's name is not sufficient to qualify the information as a record. [Citation.] Implicit in that

determination is that the information must provide information *concerning or describing the named individual* for the information to be considered a record." (*Id.* at p. 471, italics added.)

The court concluded similarly in *Unt v. Aerospace Corp.* (9th Cir. 1985) 765 F.2d 1440, holding that the defendant did not violate the Privacy Act by releasing a letter that the plaintiff wrote to a government agency about his employer, a government contractor. The court explained: "A 'record' is defined under [title 5 United States Code section] 552a(a)(4) as . . . [¶] '. . . any item, collection, or grouping of information *about an individual* that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his name, or the identifying number, symbol, or other identifying particular assigned to the individual, such as a finger or voice print or a photograph.' [¶] . . . [¶] . . . Consequently, for appellant's letter to be subject to restrictive disclosure, it must reflect some quality or characteristic about him. [Citation.] The letter, however, is not about Unt. Rather, it is clearly about Aerospace, a private corporation, and not an individual within the meaning of the statute. The letter reflects directly on the performance by Aerospace of its contract with the government, and only indirectly on any quality or characteristic possessed by appellant. While Unt's letter mentions his difficulties with Aerospace management, this fact does not change the communication into an item about him. The subject is Aerospace and was 'about' Aerospace." (*Id.* at pp. 1448–1449.) Thus, because plaintiff failed to demonstrate that his letter was a "record," the court concluded that the district court was correct in dismissing his Privacy Act claims. (765 F.2d at p. 1449.)

We find the analyses of these courts instructive here. Admittedly, the Privacy Act's definition of "record" is not precisely the same as the IPA's definition of "personal information": The Privacy Act protects "records," defined as "any item, collection, or grouping of information about an individual that is maintained by an agency," while the IPA protects "personal information," defined as "any information that is maintained by an agency that identifies or describes an individual." Significantly, however, both statutes require a relationship between the individual seeking the statute's protection and the information protected by the statute. That is, the IPA protects information that "identifies" or "describes an individual," while the Privacy Act protects information "about an individual."

For the reasons discussed in the federal cases, we reject plaintiff's contention that his exams contain "personal information" within the meaning of the IPA. Although plaintiff's exam answers were authored by him, they do not "identif[y]" or "describe[]" him. (§ 1798.3, subd. (a).) Rather, they discuss and analyze the issues that are the subjects of the exams. As the court said in

*Fisher*, the fact that a reader could "glean some insight into the type of work [plaintiff] does" by the quality of his exam answers is not sufficient to convert his exam answers into "personal information" under the IPA. (See *Fisher v. National Institutes of Health*, *supra*, 934 F.Supp. at p. 470.)

■ We also reject plaintiff's contention that his exams contain "personal information" because they contain his name or student identification number. As *Fisher* suggests, an individual's name constitutes "personal information" only when it is linked to information that "identifies or describes" the individual. For example, a record containing both an individual's name *and* his or her Social Security number contains "personal information" because it reveals the Social Security number assigned to that individual. In contrast, a record that contains only the individual's name, without any other identifying or descriptive information, is not "personal information" within the meaning of the IPA.

■ For these reasons, we conclude that student exams are not "records" containing "personal information" within the meaning of the IPA. The trial court thus properly granted summary adjudication of the first, third, fifth, seventh, eighth, and twelfth causes of action of the second amended complaint.[18]

D., E.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[18] We note that section 1798.74, entitled "Student Records," provides: "The provisions of Chapter 13 (commencing with Section 67110) of Part 40 of the Education Code shall, with regard to student records, prevail over the provisions of this chapter." The referenced chapter of the Education Code formerly addressed confidentiality of student records, but was repealed in 1995. (Stats. 1995, ch. 758, § 50, p. 5673.)

The reference in section 1798.74 to the Education Code suggests to us that when the Legislature passed the IPA in 1977, it may have intended explicitly to exempt some educational records, including student exams, from the protections afforded by the IPA. However, in view of our determination that student exams are not "records" containing "personal information," we need not reach this issue. (Cf. *Lachtman v. Regents of University of California* (2007) 158 Cal.App.4th 187, 212 [70 Cal.Rptr.3d 147] [rejecting university's contention that student records are exempt from the IPA pursuant to § 1798.74].)

*See footnote, *ante*, page 466.

## DISPOSITION

The judgment and award of costs are affirmed. Defendants shall recover their costs on appeal.

Epstein, P. J., and Willhite, J., concurred.

A petition for a rehearing was denied January 8, 2009.